## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NANCY P. MIKRUT,
     Plaintiff,

    v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA,
     Defendant.

CIVIL ACTION NO.
3:03cv1714 (SRU)

## RULING AND ORDER

Nancy Mikrut has filed suit pursuant to the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132(a)(1)(B).[1]  She seeks review of her insurer's denial of long-term

disability benefits.  Mikrut and UNUM Life Insurance Company of America ("Unum") have both

moved for judgment on the administrative record.

Mikrut has shown that Unum was influenced by a conflict of interest when it denied her

claim and that its denial was arbitrary and capricious.  Accordingly, Mikrut's motion is granted;

Unum's motion is denied.  My findings of fact and conclusions of law are set forth below.  *See*

*Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124-25 (2d Cir. 2003) (holding that a ruling on

a motion for judgment on the administrative record is akin to a bench trial "on the papers"); Fed.

R. Civ. P. 52(a).

I.    **Background**

    A.    <u>Mikrut's Injury</u>

In the late 1990's, Nancy Mikrut worked as a pediatric nurse practitioner for Danbury

---

[1] Mikrut has withdrawn her state law claim.  Pl. Memo. Supp. Motion for Judg. on the
Admin. Record (doc. # 65) at 2 n.1.

Health Systems ("DHS").  AR 00011.[2]  On October 1, 1999, she was injured in an automobile

accident.  AR 00009.  Mikrut attempted to return to her position at DHS after the accident, but

severe back pain prevented her from working.  AR 00122.  The physical demands of Mikrut's

former position include: frequent standing, walking, sitting, stooping, kneeling, crouching,

reaching/working overhead, and lifting/carrying infants and children up to fifty pounds.  AR

00023-24.

On January 6, 2000, DHS submitted to Unum a long-term disability claim on behalf of

Mikrut.  AR 00002.  Included in Mikrut's application for disability benefits were her employee's

statement and statements from several physicians.  Mikrut described her condition as "severe

back pain radiating to [right] leg, foot – limping."  AR 00009.  Dr. Charles B. Goodwin, an

orthopaedic surgeon, diagnosed Mikrut with spinal stenosis.  AR 00006-7.  In his January 4,

2000 statement, Goodwin established restrictions of no lifting, no carrying, and no long

ambulation.  AR 00006.  In a statement dated January 4, 2000, Dr. Daniel Fish, an orthopaedic

surgeon, described Mikrut's symptoms as "lumbar spine whiplash injury."  AR 00005.  His

objective finding was "low back stiffness."  *Id.*  Dr. James K. Sabshin, a neurosurgeon, described

Mikrut's condition in a letter, dated November 4, 1999.  AR 00016-17.  He concluded: "I do not

believe she can work at this point given the severity of her pain . . . ."  On January 5, 2000,

Sabshin described Mikrut as "100% disabled from any type of work."  AR 00020.

B.      Eligibility for Disability Benefits

The Unum policy sets forth a two-part standard for determining eligibility for disability

benefits:

---

[2] Citations to the administrative record are denoted: AR [page number].

You are disabled when Unum determines that:

– you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to **sickness** or **injury**; and

– you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** of which you are reasonably fitted by education, training or experience.

AR 01019 (emphases in original).

The policy's Certificate Section includes the following language regarding Unum's discretion to determine eligibility for benefits:

The policy is . . . to the extent applicable [governed] by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

AR 01025.

On January 28, 2000, Unum determined that Mikrut was eligible for benefits under the policy's "regular occupation" disability standard and began to pay her a monthly disability benefit of over $3100. AR 00058. That amount later increased to over $3500 per month. AR 01192.

C.    Further Consideration of Mikrut's Claim for Disability Benefits

After her accident, Mikrut underwent ongoing treatment for her injury, including multiple back surgeries. In July 2000, Dr. Frank Cammisa, Chief of Spinal Surgical Service at the Hospital for Special Surgery in New York, performed intradiscal electrothermal therapy

-3-

("IDET") on the L3-L4 and L4-L5 vertebrae.  AR 00101-2; 00896.  Three months after that procedure, Cammisa examined Mikrut and concluded that she could return to work part-time. AR 00103.  She attempted to do so.  In November 2000, Cammisa completed a check-off Estimated Functional Abilities Form ("EFAF") for Unum on which he indicated that she had the ability to do light activity in an eight-hour workday.[3]  AR 00116-17.

In March 2001, Cammisa performed a second IDET procedure, this time on her L1-L2 and L2-L3 vertebrae.  AR 00240-41.  At her first post-operative examination in April 2001, Cammisa noted a "[s]atisfactory post-operative course."  AR 00256.  At that exam, Mikrut reported that she was "much better than last time."  *Id.*  Cammisa described her prognosis as "good."  AR 00258.

In November 2000, a WorkNET functional capacity evaluation was conducted.  AR 00774-76.  The evaluator concluded that, although she did not meet the required lifting capacity for her particular job, Mikrut did have a light work capacity as classified by the Department of Labor.  AR 00776.

Mikrut regularly submitted supplemental claims to Unum and spoke with representatives from the insurer about her disability.  AR 00070-71, 00075, 00081, 00259.

At the end of 2001, after Unum had been paying Mikrut's disability benefit for twenty-four months, Donald Hodge, an Associate Customer Care Specialist, wrote Mikrut.  AR 00324-25.  He explained that Unum would continue to issue her monthly disability payments under a

---

[3] The form provided by Unum included a blank space on which the physician was expected to indicate the number of hours, during an eight-hour workday, that the claimant could engage in a specified level of activity.  Cammisa placed a checkmark on the blank corresponding to light activity but did not indicate a specific number of hours.  AR 00116.

reservation of rights, explaining that the insurer had not concluded its review of her eligibility for continued benefits.  AR 00324-5.  In order to continue to be eligible for benefits beyond the first two years, Mikrut had to meet the higher standard and prove that she was "unable to perform the duties of any gainful occupation" for which she was "reasonably fitted by education, training or experience."  AR 00325.

In early 2002, Dr. Lisa Bellner, Mikrut's physiatrist, described a "recent deterioration" in Mikrut's condition.  She established various physical limitations and restrictions and noted that Mikrut was not released to work in her occupation or any occupation.  AR 00670.  Shortly thereafter, Bellner moved out of state, and Mikrut was unable to continue treatment under her care.  *Id.*

On February 25, 2002, Unum employee Al Baldassari conducted an unannounced visit at Mikrut's home.  AR 00754-57.  He interviewed Mikrut concerning her injury, restrictions, daily activities, future plans, and financial status.  *Id.*  Baldassari observed Mikrut and her surroundings and described Mikrut as "appearing fatigued and somewhat frail."  AR 00756.

Dr. Barry Gendron, a Unum medical consultant and osteopath, reviewed Mikrut's file, including all of the medical records that had been submitted to the insurer.  AR 00784-87.[4]  He did not did not examine Mikrut, but summarized his evaluation of her file in a report dated April 5, 2002.  *Id.*  During his review of the file, Gendron spoke with Dr. Jonathan Kost, the attending physician overseeing Mikrut's care after Bellner's move.  AR 00777-78.  Kost indicated to Gendron that he did not have a specific recollection of Mikrut and that he wanted to review her

---

[4] At least one of Gendron's reports appears to misidentify his qualifications.  The typed signature line, "Barry C. Gendron, M.D.," conflicts with his signature, "Barry Gendron[,] DO."  AR 00784.

EMG nerve conduction study and WorkNET functional capacity evaluation before commenting

on her capabilities, although he did "speculate," based on her diagnoses, that she should be

capable of full-time sedentary work.  AR 00778.  Kost stated that he would be willing to

complete an EFAF at her next office visit three to four weeks later.  *Id.*  Gendron considered

Mikrut's most recent MRI and determined that it did not identify any pathology that would

preclude sedentary capacity.  AR 00785.  He concluded that Mikrut "[s]hould be fully capable of

sedentary work activities with occasional position changes."  AR 00784.  Gendron also noted,

however, that he was awaiting EMG data "to attempt to assess whether a component of cervical

radiculopathy is present."  AR 00785.  His "analysis of medical evidence" failed to mention

Mikrut's reports of severe pain, and his conclusions identified no limitations despite the

consistent limitations imposed by Mikrut's treating physicians.

Following his conversation with Gendron, Kost completed an Estimated Functional

Abilities Form for Unum apparently without awaiting Mikrut's next office visit.  AR 00789-90.

The following information was provided on a form supplied by Unum on which Kost merely

checked appropriate boxes, corresponding to Mikrut's abilities and level of capacity.  On that

form, dated May 6, 2002, Kost noted Mikrut's occasional lifting capacity up to 20 pounds.  AR

00790.  He stated that she could occasionally bend, climb stairs, reach above her shoulder, and

push or pull up to 25 pounds, but that she could never kneel or crawl.  *Id.*  He noted that she

could not use her right foot for repetitive movement or operating a foot control and that she was

unable to use her right hand to power grip.  AR 00790.  He also noted that she had use of both

hands for simple grasping and fine manipulation, and had medium dexterity.  *Id.*  By filling in a

black with the number "8", Kost indicated the number of hours during the work day that Mikrut

could engage in light activity.  AR 00789.

Thereafter, Michael Tyler, a Unum Customer Care Specialist, requested that Unum commission a transferred skills analysis "for up to full-time light capacity."  AR 00792-93.  That analysis, conducted by GENEX, a vocational consulting company, considered referral information, the EFAF completed by Kost (dated May 6, 2002), and Mikrut's diagnosis of spinal stenosis.  AR 00799.  The labor market area of Southbury, Connecticut, was used to determine the various occupations available to her.  AR 00797-800.  The results of the transferable skills analysis showed seven occupations in the local geographic area and economy that were appropriate for Mikrut, given her educational level, work history experience, full-time sedentary to light work capacity, and restrictions.  AR 00797.  The analysis was dated May 18, 2002.  AR 00799.

In the interim, Kost had provided a second EFAF, dated May 13, 2002.  AR 00803-805.  On that assessment, Kost indicated that Mikrut's lifting capacity was limited to occasionally lifting up to 10 pounds; she could occasionally bend and climb stairs, but could never kneel, crawl, or reach above her shoulder.  AR 00805.  She was not able to use her left hand to power grip, and lacked dexterity or the ability to power grip with her right hand.  AR 00085.  He noted that in an eight-hour workday, Mikrut would be capable of sedentary activity for up to eight hours, changing positions as needed.  AR 00804.  The evaluation did not indicate the extent of Mikrut's ability to push/pull.  AR 00805.

On May 24, 2002, Gendron contacted Kost's office to clarify the disparities between the two forms.  AR 00813-14.  The differences between the two forms included: (1) a reduction in Mikrut's lifting capacity from 25 pounds to 10 pounds; (2) functional capacity of only sedentary

rather than light activity during an eight-hour workday; (3) a lack of dexterity with the right hand, and (4) no ability to reach above the shoulder.  Kost responded that the form that was dated May 13, 2002 should be used, but clarified that Mikrut was able to push/pull up to 25 pounds.

Gendron then provided a second evaluation of Mikrut's file, concluding in a memorandum, dated May 23, 2002, that she was capable of sedentary work capacity based on her diagnoses and the results of the field visit.  AR 00811.  In short, he concluded that Mikrut "has full-time sedentary capacity, and her only medically supported restriction would be an inability to utilize extremes of power grip with the right hand, use the right foot for repetitive movement for operating foot controls, kneeling and crawling."  AR 00811.  In his view, the first EFAF completed by Kost (dated May 6, 2002) was a more accurate summary of Mikrut's capacity, although he never examined Mikrut personally.  AR 00811.  He wrote: "In my opinion, beyond the inability to lift up to 20 pounds, I believe that the restrictions and limitations noted on the 05/06/02 form are the most accurate portrayal of the claimant's functional activities.  There is no medical evidence or medical data to support an inability to reach above the shoulder, or to use the hands for bi-manual dexterity."  *Id.*  Again, in analyzing her claim, Gendron failed to take into account Mikrut's complaints of pain.

Tyler referred Mikrut's Unum file to Shannon Haskell.  AR 00823.  Haskell agreed with Tyler to terminate Mikrut's long-term disability benefits, concluding that Mikrut had sedentary work capacity and alternate gainful occupations had been identified.  AR 00823.  On June 18, 2002, Tyler wrote to Mikrut, summarizing the file and setting forth Unum's conclusions regarding her ineligibility for further benefits.  AR 00825-29.  After listing the pieces of "information" that Unum reviewed – including Mikrut's own complaints as well as Bellner's

diagnoses, conclusions, and restrictions – Tyler then described the "medical data" pertaining to

Mikrut's claim.  AR 00827-28.  That data appeared to consist of only Mikrut's most recent MRI.

AR 00827.

Following its adverse decision, Unum received a letter, dated June 24, 2002, from

Cammisa, and copies of his office notes from his initial consultation on January 31, 2000 and

visits thereafter.  AR 00830-45.  Cammisa explained that Mikrut "is unable to perform any work

and is therefore, totally disabled."  AR 00845.

Tyler then requested that Mikrut's new medical information be submitted for a medical

review.  AR 00855.  Specifically, he submitted the referral question whether "the additional

medical data support the claimant's inability to perform [at] a sedentary level." *Id.*  Dr. Brian

Brock, an osteopath, reviewed the file, including Cammisa's letter and Gendron's April and May

2002 reviews and an EMG report, dated April 4, 2002.  AR 00851-54, 00861.  His analysis did

refer to Mikrut's "stated recurrent lowback [sic] and leg symptomatology," but only in

concluding that "available medical evidence" did not support her claim that she lacked sedentary

capacity.  AR 00852.  Despite the additional materials, Brock concluded: "The prior reviews are

not significantly impacted by this new information and prior estimated restrictions limitations

[sic] given by Dr. Gendron and Dr. Kost still appear appropriate." *Id.*

Cammisa wrote Unum again on August 16, 2002.  He explained that Mikrut "has lower

back pain[,] which is disabling" and that she had "failed conservative treatment for her spine."

AR 00862.  He concluded that she is "markedly disabled for any occupation" and that she is "not

able to perform any activities which require bending, lifting, pushing, pulling, standing and [sic]

sitting for extended periods of time." *Id.*  Tyler again referred Mikrut's file, including the most

recent letter, to Brock for review.  AR 00867.  Once again, Brock concluded that the prior

reviews were not significantly impacted by the new information.  AR 00866.  In a section labeled

"Analysis," he wrote: "The narrative lists claimant stated symptoms and complaints of both the

neck, right arm and lowback [sic]." *Id.*  There is no indication, however, that Brock considered

those complaints in reaching his conclusions.

      In a letter dated September 6, 2002, Tyler wrote to Mikrut to inform her that Unum would

not reverse its earlier decision.  AR 00868-69.  He made note of the additional information that

Unum reviewed, namely Mikrut's EMG data and the "narratives" and treatment notes from

Cammisa.  AR 00869.  There was no indication that Unum's further consideration of Mikrut's

claim took into account her reports of pain.

      Tyler also indicated that Mikrut's entire file had been forwarded to the company's Quality

Performance Support Unit for an impartial review of her claim.  AR 00868.

      Mikrut appealed Unum's decision in a letter dated August 28, 2002.  AR 00870-71.

Unum's Tanya Floerchinger, an appeals specialist, handled Mikrut's appeal.  AR 00872.  On

January 31, 2003, Floerchinger wrote Mikrut's attorney, Stephen Curley, to inform him that

Unum was upholding its prior decision, denying her claim.  AR 00886-90.  The letter recounted

the materials that Mikrut had submitted, but it did not indicate that Unum had given any

consideration whatsoever to Mikrut's pain.  *Id.*

      Mikrut appealed the adverse decision a second time and provided further documentation

to Unum.  AR 00896-99; 00906; 00909-15.[5]  That documentation included letters from

---

      [5] Some of those documents may have been submitted "for settlement purposes only," but
were, in fact, considered by Unum in making its claims decision.

physicians, including one of Mikrut's attending physicians, Dr. David Levi and Dr. Vincent L.

Perri, a chiropractor; a copy of her notice of award of disability benefits from the Social Security

Administration; and a second functional capacity evaluation, completed by WorkNET and dated

August 19, 2002.  According to that evaluation, focused on Mikrut's capacity with respect to her

previous occupation, Mikrut's performance had decreased significantly from the previous

functional capacity evaluation on November 8, 2000.  AR 00934.  She demonstrated only a

sedentary – not light – work capacity in August 2002.  AR 00931-35.  She was, however, only

able to sit for two-and-one-half minutes.  AR 00936.

Brock reviewed the additional information that was submitted as part of Mikrut's second

appeal.  AR 00936-37.  He assessed the new material to determine whether it was relevant to the

state of Mikrut's condition in May 2002 when her claim for continued benefits was denied.  AR

00937.  Brock concluded that the new information was "not sufficient for me to conclude that

[Mikrut] would have required any new restrictions and limitations as of 5-31-02."  *Id.*

In April 2003, Peter Boyle, Senior Vocational Rehabilitation Counselor with

Connecticut's Department of Social Services, described Mikrut as "too severely disabled to

pursue competitive employment."  AR 00944.   He noted that her case was closed as of April 21,

2003, because Mikrut was "too severely disabled to benefit" from the agency's services.  *Id.*

Boyle described his agency's relationship with Mikrut:

> Nancy Mikrut applied or services with our agency in Nveomber of 2000.  At
> this point she had been out of work for one year because of her physical
> condition, but was hopeful of returning to work in her previous capacity as a
> pediatric nurse – perhaps 6 hours a week to start.  As you can see from the
> medical records, her medical condition continued to deteriorate and it then
> became clear she could not return to work as a pediatric nurse.  In looking
> toward more sedentary work a plan was then developed to assist Nancy in

-11-

obtaining an advanced degree in Nursing Science.  Unfortunately this plan
was discontinued because of continuing medical complications necessitating
surgery and a pending rehabilitation.

Throughout her involvement with our agency Nancy has impressed me as a
highly motivated, intelligent professional who has put forth her best efforts.
It is also my impression she is too severely disabled to pursue competitive
employment at this time.  Her medical condition – although treatable – has
continued to deteriorate since her initial contact with our agency.  In
discussing the matter with Nancy her most recent concern is the pain factor.
The fatigue and cognitive compromise associated with the pain and pain
medication further restrict her.

*Id.*

On April 30, 2003, Unum denied Mikrut's second appeal.  AR 00939-42.  In that final

denial, Unum first refers to Mikrut's award of Social Security disability benefits and demands

that Mikrut remit over $8000, asserting that Mikrut was overpaid by Unum because she received

long-term benefits under the policy that were not reduced by her Social Security disability

benefits.  AR 00939.

## II.   Discussion

Mikrut first argues that Unum's decision was influenced by a conflict of interest, thereby

triggering *de novo* review.  Mikrut also argues that under either the default, arbitrary and

capricious standard or under *de novo* review, Unum's denial of her claim should be reversed.

### A.   Standard of Review

#### 1.   *Reservation of Discretion*

Generally, the district court reviews *de novo* a denial of benefits under an ERISA plan

"unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 115 (1989).

The Unum policy at issue in this case includes a provision regarding Unum's discretion to determine eligibility under the policy:

> When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

AR 01025.

That language is located in the policy's Certificate Section, but not in the Summary Plan Description ("SPD"), a document required by statute to be provided to plan participants. 29 U.S.C. § 1022(a). The SPD must include certain details, including the requirements respecting eligibility for participation and benefits and circumstances that may result in disqualification, or denial or loss of benefits. 29 U.S.C. § 1022(b). Although Mikrut had argued that the court should review her claim *de novo* because the reservation of discretion was not included in the SPD, she now concedes that discretionary language need not be in the SPD to be effective. Pl. Fourth Suppl. Memo. (doc. # 93) at 1. The Second Circuit recently held that the "arbitrary and capricious standard of review is warranted where the plan documents provide for discretionary authority, the summary plan description does not contain any conflicting language, and the applicable statutes and regulations do not require that the SPD contain provisions addressing the issue." *Tocker v. Philip Morris Companies*, ___ F.3d ___, 2006 WL 3404805 2006 (2d Cir. Nov. 22, 2006).

### 2.   *Conflict of Interest*

*De novo* review is also available if a plan administrator was influenced by a conflict of interest in denying benefits. When a plan grants discretion to the administrator, but there are

allegations that the administrator acted under a conflict of interest, the plaintiff "must show that

'the administrator was *in fact* influenced by the conflict of interest'" in order to trigger *de novo*

review. *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000), *quoting Sullivan v.*

*LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1256 (2d Cir. 1996).

Unum's dual role as both plan administrator and plan insurer is alone insufficient as a

matter of law to trigger stricter review. *Id.* at 92. There is no dispute that Unum labored under

that "inherent conflict." *Cf. Fay v. Oxford Health Plan*, 287 F.3d 96, 109 (2d Cir. 2002). The

plaintiff must also show that Unum's decision was in fact influenced by the conflict in order for

review of the decision to be *de novo. Pulvers*, 210 F.3d at 92.

Mikrut points to Unum's handling of her claim to argue that the insurer was influenced by

a conflict of interest. In short, Mikrut argues that Unum ignored her self-reports of debilitating

pain and the submissions of her surgeon and other health care providers in favor of the check-off

forms submitted by Kost and the opinions of two consultant osteopaths who reviewed her file at

Unum's request. She asks the court to infer that such treatment of her claim shows that Unum

was in fact influenced by a conflict of interest when it determined that she was ineligible for

benefits.[6] I agree with Mikrut for several reasons.

---

[6] Mikrut also argues that Unum "baselessly" failed to conduct an independent medical examination ("IME"). Unum was not required by law to conduct an IME. *See, e.g.*, *Couture v. Unum Provident Corp.*, 315 F. Supp. 2d 418 (S.D.N.Y. 2004). Nor do the terms of the plan require that the administrator conduct an IME. The policy provides:

> We may require you to be examined by a doctor, other medical practitioner or vocational expert of our choice. UNUM will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized UNUM Representative.

AR 01018.

-14-

First, Unum did not address Mikrut's reports of pain when analyzing her disability claim. In its denial letters and in Gendron's and Brock's reports, Unum and the consultants provide an exhaustive litany of the materials in Mikrut's file, including her statements concerning her pain. There is, however, no substantive analysis of the impact of her pain on her ability to work, even in only a sedentary capacity.  In other words, her reports of pain were not a factor in Unum's determination of her disability.  The significance of an individual's complaints of pain is undeniable.  "It has long been the law of [the Second] Circuit that the subjective element of pain is an *important factor* to be considered in determining disability."  *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (emphasis added, internal quotation marks and citation omitted).  In fact, the Court of Appeals has held that in the ERISA context a claimant's subjective reports of pain alone, if believed, can be legally sufficient evidence of disability.  *See Krizek v. CIGNA Group Ins.*, 345 F.3d 91, 102 (2d Cir. 2003).

Second, Unum rejected the evaluations of Mikrut's treating physicians in favor of the opinions of consultants who reviewed Mikrut's file but never met or examined her.  The Supreme Court has held that ERISA "plan administrators are not obliged to accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  ERISA does not require administrators "to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."  *Id.*  Nevertheless,

---

Unum conducted a home visit and interviewed Mikrut, but Unum did not require Mikrut to undergo an independent medical examination.  The plan provision regarding IME's does not set forth any criteria for determining when Unum may require a claimant to be examined by a Unum doctor, nor does it impose on Unum the requirement – however wise – to conduct an IME in particular circumstances, such as when its consultants disagree with the claimant's treating physicians.

plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.  Here, Unum referred Mikrut's file to its consultant physicians to evaluate her condition.  Although neither Gendron nor Brock examined Mikrut, both concluded that she had capacity for sedentary work, focusing almost exclusively on objective test results and without evaluating the relevance of her complaints of pain or crediting the conclusions of the majority of her treating physicians.  *Cf.*, *e.g.*, *Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) (noting that administrator had discretion to credit opinions of two independent physicians, who personally examined plaintiff, rather than those of plaintiff's own physicians).  Unum adopted Gendron's and Brock's opinions, which contrasted with the conclusions of Beller, Cammisa, Perri, and Levi, who all treated Mikrut.[7]

Unum's adoption of the opinions of consultants who never examined Mikrut and its complete disregard of Mikrut's complaints of pain suggest that Unum was influenced by a conflict of interest.  Most probative of the alleged actual conflict, however, is Unum's treatment of Mikrut's award of Social Security disability benefits.

One of Mikrut's strongest pieces of evidence in support of her disability claim is the

_____

[7] Unum places inordinate emphasis on the two check-off forms that one of Mikrut's attending physicians provided.  Its reliance on those forms – while discrediting numerous, detailed letters submitted on Mikrut's behalf – suggests a results-oriented approach, if not mere "cherry-picking."  *Cf. Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (concluding that insurer "cherry-picked" claimant's file and forwarded only one aberrant form evaluation to vocational consultant in hopes of obtaining a favorable report with respect to claimant's work ability).

finding of the Social Security Administration ("SSA"). The SSA determined that, as of May 21, 2001, she was totally disabled, as thus could not "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). That standard, which is not restricted to any geographic area, is stricter than the applicable standard under Unum's policy. Unum failed to take account of the SSA's findings in its consideration of Mikrut's long-term disability claim. At the same time, Unum took advantage of Mikrut's award of Social Security disability benefits to demand that she refund over $8000 based on Unum's claimed overpayment in light of the SSA award. AR 00939-40. The Sixth Circuit recently discussed the significance of an administrator's failure to address an SSA finding of total disability while benefitting financially from the Social Security payments. *See Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006) (noting that plan administrator should have given "appropriate weight" to SSA determination and holding that its failure to address the SSA's finding is a factor that can render the denial of benefits arbitrary and capricious).

Although the findings of the SSA are not binding on Unum, *see Paese v. Hartford Life and Accident Ins. Co.*, 449 F.3d 435 (2d Cir. 2006), its treatment of that evidence, namely using it to demand a return of funds but failing to factor it in its analysis of Mikrut's claim, reveals that Unum's decision was actually affected by its conflict of interest. Courts have regularly held that the SSA's findings with respect to disability are some evidence of total disability under an ERISA plan, even if they are not binding. *See id.* (citing, e.g., *Billenger v. Bell Atlantic*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003)).

Mikrut has shown that Unum's decision was, in fact, influenced by the inherent conflict of an entity that both administers and insures a plan. Unum adopted the reports of internal

consultants, who never personally examined her, over the conclusions of Mikrut's treating

physicians, placing disproportionate reliance on two check-off Unum forms that were completed

by one attending physician, who, when asked about Mikrut's condition, did not recall who she

was.  It refused to address Mikrut's subjective complaints of pain in its analyses.  Most

significantly, Unum failed to address the SSA's findings, while at the same time relying on her

SSA benefits to demand a refund of over $8000.

Therefore, despite Unum's reservation of discretion to determine eligibility and interpret

the plan terms, because there is a conflict of interest that actually impacted its decision, I will

review Mikrut's claim for benefits *de novo*.  *See Firestone*, 489 U.S. at 115.

B.      *De Novo* Review of the Merits

The Unum policy requires the insurer to pay Mikrut disability benefits if she meets the

following standard:

> After 24 months of payments, you are disabled when Unum determines that
> due to the same sickness or injury, you are unable to perform the duties of any
> **gainful occupation** of which you are reasonably fitted by education, training
> or experience.

AR 01019 (emphasis in original).

Reviewing the evidence in the administrative record *de novo*, I find that Mikrut is eligible

for disability benefits under the plan because, as of May 31, 2002, due to the injury she sustained

as a result of the October 1999 automobile accident, Mikrut was unable to perform the duties of

any gainful occupation for which she was reasonably fitted by education, training or experience.

Mikrut's condition improved following her IDET procedures, and Cammisa released her

to part-time work in the fall of 2001, although her attempt to return to work was unsuccessful.

AR 00103.  In early 2002, however, Mikrut's condition deteriorated.  AR 00670.  Beller, her

attending physician, established physical limitations and restrictions on Mikrut and would not

release her to work in any occupation.  *Id.*

According to Mikrut's surgeon, Cammisa, Mikrut "is unable to perform any work and is

therefore, totally disabled."  AR 00845.  In his view, Mikrut's back pain is "disabling" and she is

"markedly disabled for any occupation" and "not able to perform any activities which require

lifting pushing, pulling, standing [or] sitting for extended periods of time."  AR 00852.

Doctors Levi and Perri both concur that Mikrut is disabled from work.  Although Levi's

letter focused on Mikrut's inability to return to work as a pediatric nurse, AR 00897, Perri noted

that Mikrut was "at the highest level of pain that we can subjectively and objectively rate . . . ."

AR 00906.

Additionally, Unum's employee described Mikrut's appearance as "frail" and "fatigued"

when he conducted his unannounced visit in February 2002.  Boyle, a Senior Vocational

Rehabilitation Counselor at the Connecticut Department of Social Services, described Mikrut as

"too severely disabled to pursue competitive employment" or to benefit from his agency's

services.  AR 00944.[8]

Moreover, Mikrut has repeatedly described – to her physicians and directly to Unum –

the leg and back pain that she suffers.  That subjective element of pain is significant, and the

evidence that Mikrut suffers debilitating pain is substantial.  Her credibility has not been

questioned by anyone who has treated her.

_____

[8] I acknowledge that Boyle's letter is dated April 2003, so his conclusions do not
necessarily support the determination that Mikrut was completely disabled in May 2002.

Finally, the Social Security Administration has determined, under its more stringent

standard, that Mikrut is totally disabled and qualifies for Social Security disability benefits.  AR

00909-912.

In my view, the two Unum forms that were completed by Kost and the reports of Gendron

and Brock are outweighed by the evidence in support of Mikrut's claim of total disability.

Moreover, the WorkNET functional capacity evaluation was focused on her capacity  to work as

a pediatric nurse; thus, even though the evaluation reflected a sedentary capacity, I do not find it

persuasive evidence of Mikrut's abilities.

C.      Arbitrary and Capricious Review of the Merits

Even if its conflict of interest did not actually influence Unum, I conclude that its denial

of Mikrut's long-term disability claim was arbitrary and capricious.

Under arbitrary and capricious review, I may overturn Unum's decision to deny Mikrut's

long-term disability benefits only if that denial was "without reason, unsupported by substantial

evidence or erroneous as a matter of law."  *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d

Cir. 1995).  "Substantial evidence is 'such evidence that a reasonable mind might accept as

adequate to support the conclusion reached by the [administrator and] . . . requires more than a

scintilla but less than a preponderance.'"  *Celardo v. GNY Automobile Dealers Health & Welfare

Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066,

1072 (2d Cir. 1995)).

Unum paid Mikrut disability benefits for over two years following the car accident that

injured her.  The insurer found that she was unable to return to her position as a pediatric nurse

and was, thus, qualified for disability benefits for twenty-four months.  Thereafter, Unum

-20-

considered her claim under the more stringent standard and concluded that she was capable of performing the duties of an occupation for which she was reasonably fitted by education, training, or experience.  Upon reviewing the administrative record, I find that Unum's denial was unsupported by substantial evidence and erroneous as a matter of law.

Unum issued several letter decisions, effectively adaptations of the reports of its consultant osteopaths, in which it set forth its analysis of Mikrut's claim for long-term disability benefits.  In its first denial letter, Unum's analysis of Mikrut's claim was focused solely on the results of the MRI and the two Estimated Functional Abilities Forms that Kost completed.  AR 00826-27.  There was no mention of Mikrut's reports of debilitating pain, Bellner's statements, or the observations of Baldassari, who conducted the field visit at Mikrut's home.  Unum appears to have completely disregarded Mikrut's documented history of back pain despite its "review" of her file.

In re-considering her claim, Unum again failed to take into account Mikrut's complaints of pain or the restrictions that her physicians prescribed.  After summarizing Cammisa's August 16, 2002 "narrative," Tyler noted that it included "no other diagnostic testing information or clinical data."  AR 00869.  Although Cammisa was the surgeon who had performed Mikrut's two IDET procedures and who had been treating her for over two years, his conclusion – that Mikrut had disabling back pain – did not factor into Unum's determination.  Rather, Unum dismissed it because "no new testing or clinic data" had been provided.  AR 00897.  Unum relied almost exclusively on two EFAFs that were completed by a doctor who had been caring for Mikrut for a few months and who "speculated" about her capabilities despite his inability to recollect her. The Unum consultants never examined Mikrut personally, and their reports did not weigh her

complaints of pain as a factor potentially precluding full-time work.

In its final denial, Unum refused to consider as a factor the SSA's finding of total disability but, based on that finding, demanded that she refund a claimed overpayment in excess of $8000. Unum's dual role as both plan administrator and plan insurer is a factor to be weighed in determining whether there has been an abuse of discretion. *See Pulvers*, 210 F.3d at 92.

Unum's decision was unsupported by substantial evidence. A reasonable person would not accept as adequate the reports of two consultants who did not personally examine Mikrut, and who relied heavily on the two, undetailed check-off forms that were completed by Kost. The Unum form lists four category of functional ability, ranging from sedentary to heavy. There is no category corresponding to "no ability" or "totally disabled." Although Kost did indicate that Mikrut could engage in sedentary activity, he did so by merely placed an "8" in the blank corresponding to the lowest level of capacity listed on the form. AR 00804. He did not describe her abilities whatsoever.

Moreover, Unum's denial of Mikrut's claim was erroneous as a matter of law because the insurer failed to consider the SSA's finding of disability and Mikrut's reports of pain. *See Paese*, 449 F.3d at 435 (noting that SSA finding is some evidence of disability); *Connors*, 272 F.3d at 136 ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.").

## III.   Attorneys' Fees

In an action to recover ERISA benefits, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating . . .

rights, even when small amounts are involved." *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 872 (2d Cir. 1987).

The Second Circuit set forth the factors to consider when determining whether to award attorneys' fees in *Chambless*:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Id.* at 871.

Four of the five *Chambless* factors favor an award of attorneys' fees. There is no dispute that Unum is able to satisfy an award of attorneys' fees. In addition, such an award would deter other entities, who both administer and insure an ERISA plan, from ignoring important factors, notably subjective reports of pain and SSA findings, when considering a claim for benefits. I have described the relative merits of the parties' positions and find that the strength of Unum's position – based on its multi-level review, willingness to receive additional evidence, and multitude of letter decisions – is undercut by the insurer's failure to take into account whatsoever Mikrut's most significant evidence of disability, namely the reports of pain and the SSA's findings.

With respect to the first factor, Unum may not have acted in bad faith, but its conduct was, nevertheless, culpable. The Second Circuit has clarified that the first *Chambless* factor is a disjunctive one, noting that "'culpability' and 'bad faith' are distinct standards." *Paese*, 449 F.3d at 450. It is not necessary to consider both culpability *and* bad faith. *Id.* "[A] defendant is

'culpable' under *Chambless* where it 'violated ERISA, thereby depriving plaintiffs of rights under a pension plan and violating a Congressional mandate.'" *Id.* (quoting *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000)).  To be "culpable," Unum's conduct need only be "blameworthy," "censurable," or involve "the breach of a legal duty or the commission of a fault."  *See id.* (quoting Black's Law Dictionary (6th ed. 1990)).  As described above, the degree of Unum's culpability is significant.  The insurer issued repeated decision letters in which it chronicled the evidence in Mikrut's file but failed to actually consider her subjective pain when concluding that she had capacity for gainful employment.  Most importantly, in its final denial, Unum failed to take into account the SSA's finding of disability, yet demanded that Mikrut refund over $8000 because she had received SSA benefits while receiving disability benefits from Unum.

The fifth factor does not favor Mikrut because this action does not confer a common benefit on a group of participants.  Nevertheless, "failure to satisfy the fifth *Chambless* factor does not preclude an award of attorneys' fees."  *Locher v. Unum Life Ins. Co. of America*, 389 F.3d 288, 299 (2d Cir. 2004).

Accordingly, I exercise my discretion to award Mikrut reasonable attorneys' fees and costs of this action.[9]

**IV.    Conclusion**

Unum's denial of Mikrut's claim for long-term disability benefits fails under both *de novo* and arbitrary and capricious review.  Accordingly, Mikrut's motion for judgment on the

---

[9] Any motion for attorneys' fees shall be filed no later than fourteen days after entry of judgment, Fed. R. Civ. P. 54(d)(2)(B), and shall be supported by affidavits and contemporaneous time records.

administrative record (doc. # 59) is granted.  Unum's motion for judgment on the administrative

record (doc. # 49) is denied.

The clerk shall enter judgment and close this case.


It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of December 2006.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge